Dwight Dewitt **ROBISON**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 20752.

United States Court of Appeals
Ninth Circuit.

May 18, 1967.

Rehearing Denied July 3, 1967.

Howard H. Engelskirchen, Santa Clara, Cal., for appellant.

John P. Hyland, U. S. Atty., William Shubb, Asst. U. S. Atty., Sacramento, Cal., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before JERTBERG and MERRILL, Circuit Judges, and MATHES, District Judge.

MATHES, District Judge:

This is an appeal from a judgment of conviction and sentence entered in the District Court upon a jury verdict of guilty as to each of the six counts of the indictment. In counts I and III and V, appellant was charged with three separate sales of narcotics [heroin], in violation of 21 U.S.C. § 174. In each of the remaining counts II and IV and VI, appellant was charged with a transfer of the heroin without the required written order from the person to whom the narcotic drug was transferred, contrary to 26 U.S.C. § 4705(a).

In an earlier indictment, returned and filed April 28, 1961, appellant had been charged with the same three violations of 21 U.S.C. § 174 as are charged in counts I and III and V of the indictment at bar; and appellant had entered a plea of guilty to the first count of this earlier indict-

ment. He was sentenced to 15 years imprisonment on the first count and the second and third counts were thereupon dismissed. Thereafter, appellant filed a motion under 28 U.S.C. § 2255 to vacate and set aside the fifteen-year sentence upon the ground that his plea of guilty was not voluntarily made. [Fed.R.Crim. P. 11.] This motion was granted.

A new indictment was promptly returned on August 13, 1965, charging appellant with the six offenses described at the outset of this opinion. Following trial upon his pleas of not guilty, the jury convicted appellant on all six counts; and it is from concurrent sentences of ten years imposed as to each of counts I and II, and of fifteen years imposed as to each of counts III, IV, V, and VI, that this appeal is prosecuted.

 The evidence introduced at the trial, viewed as it must be in the light most favorable to the prosecution [see Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958)], warranted a jury finding that the material facts of the case were these. On March 8, 1961, a Federal Bureau of Narcotics informant who had previously engaged in dealings with appellant involving small quantities of heroin, telephoned from San Francisco to appellant in Sacramento. In the course of that telephone conversation, appellant agreed to "make a meet" and sell informant a "spoon" of heroin for $50.00. Pursuant to this prearrangement, the informant and Federal narcotics agent Lee went by automobile to Sacramento, and there met appellant at a Sacramento amusement place called Playland.

Appellant was aware of the presence of agent Lee, who posed as an ostensible purchaser of larger quantities of heroin; but appellant refused to be introduced to him. The informant then gave appellant $50.00 in currency, which had been supplied him by Federal agents to enable him to make the "buy", and was thereupon directed by appellant to follow him to his hotel room, where appellant gave the informant a yellow balloon containing some heroin. As this transaction

was closed, appellant assured the informant that what appellant had supplied him was a "pretty nice package", and that the informant should be able to use a portion of the narcotics and still "make [his] money back" by reselling the rest.

A few days later, on March 14, 1961, appellant again met by prearrangement with the informant who then introduced appellant to agent Lee. Agent Lee discussed with appellant the possibility of purchasing a larger amount of heroin— "pieces, which would mean an ounce." Appellant quoted a per-ounce price of around $375.00 and thereupon contacted another man who appellant stated could take Lee "to the same source of supply that he had." It developed that the other party was unable to "find this man", so Lee and the informant and appellant made arrangements to meet again two days thereafter, on March 16th.

Agent Lee himself telephoned appellant on March 16th, and inquired whether "the deal was set". Appellant replied that it was; and appellant, agent Lee, and the informant then met at Hart's Cafe in Sacramento where the informant handed appellant $100.00 in bills. Appellant again directed the informant to go to appellant's hotel, instructing Lee to wait at the cafe. On the stairway of the hotel, appellant produced a white envelope containing heroin from under the stairway carpet and gave it to the informant.

Six days later, on March 22nd, Lee again telephoned appellant and arranged another meeting at Hart's Cafe where Lee gave appellant $165.00 as advance payment for three "spoons" of heroin. The informant was not present on this occasion. Appellant left the cafe for the heroin, but returned without any; and appellant thereupon repaid Lee all but $5.00 of the intended purchase price.

On the following day, Lee again met with appellant, who took $160.00 from Lee and said he would meet him later at Hart's Cafe. While Lee was waiting at the cafe, an unidentified person approached and inquired whether he was

Lee. Lee replied in the affirmative; whereupon the third party said, "I am here for Robbie [appellant]", and instructed Lee to drive his automobile to another location. This Lee did, and there observed appellant and the unidentified third party together. Appellant then approached and entered Lee's car, placed a folded newspaper on the seat, and suggested that they have a drink at a nearby bar, advising Lee to lock his car as they got out. In the bar, appellant told Lee that the heroin was in the folded newspaper on the seat of Lee's automobile, and that he could arrange to sell Lee ounce lots in the future.

Eight days later, on March 31st, by prearrangement appellant telephoned Lee at the latter's home, and said that "he could get * * * [Lee] a better deal than ounces"; that he could sell Lee twenty "spoons" of heroin for $500.00. Appellant and Lee then arranged a meeting, whereat Lee advanced or "fronted" to appellant the requested $500.00. Appellant then left Lee to procure the promised twenty "spoons", but failed to return with either the heroin or the $500.00; indeed, appellant did not return at all. In April of 1961, appellant was arrested, and his prosecution for the sales of heroin on March 8th and 16th and 23rd followed.

Appellant's first contention upon appeal is that counts II and IV and VI of the indictment are time barred by the three-year period of limitations specified in 26 U.S.C. § 6531, because these offenses do not fall, as contended by appellee, within the exceptions found in § 6531 allowing a six-year period within which to commence prosecution. But we need not decide this question, since the period of limitations as to the sales of heroin charged in the remaining counts I and III and V is clearly five years. [See: 18 U.S.C. § 3282; Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705, 707 n. 4 (1965).] And, as already stated, the sentences imposed on the counts in question commence and run concurrently with those imposed on the remaining counts. [See: United States

v. Gainey, 380 U.S. 63, 65, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929); Ayala v. United States, 371 F.2d 515 (9th Cir. 1967).]

■ Appellant argues, nonetheless, that the statute of limitations question as to counts II and IV and VI must be decided, because if these "order-form" offenses were time barred, it was prejudicial error to force him to trial on the "sale" offenses along with the time-barred "order-form" offenses. As we view the matter, however, even assuming that the "order-form" counts II and IV and VI were barred by the statute of limitations, the addition of these charges could not possibly have prejudiced appellant's position at the trial of the "sale" counts I and III and V, inasmuch as the former were addressed to the same transactions as the latter, and of course involved only the question of whether appellant had sold the heroin "not pursuant to a written order". [See 26 U.S.C. § 4705(a).]

■ Appellant next urges that the almost five-year delay between the commission of the offenses charged and the time of trial operated to deny him a fair trial. Yet appellant's reindictment within the statutory period of limitations for the "sale" offenses charged in the first count as well as the previously-dismissed second and third counts of the first indictment is unassailable [Munich v. United States, 337 F.2d 356, 361 (9th Cir. 1964)]. And the delay of less than six months between indictment and trial is surely not open to criticism, especially in view of appellant's four intervening requests for continuances, only the last of which was denied.

■ Appellant advances the further contention that in all events it was prejudicial error for the trial court to instruct the jury not to concern themselves with the time lapse, because "the instant case had to be instituted to finally dispose of the charges against the defendant." In our opinion, however, the instruction read in its entirety was eminently fair

to both the accused and the prosecution, since it placed sole blame for the delay upon the court and did not leave the jury to speculate as to possible fault of either side of the case.

■ Appellant also urges reversal of his conviction as to the offenses charged in counts V and VI, upon the ground of claimed insufficiency of the evidence. We think the evidence is clearly sufficient to sustain appellant's conviction on these counts, but in view of our disposition as to the sale offense charged in count III, for which an equal and concurrent sentence was imposed, we need not consider the claimed insufficiency of the evidence as to counts V and VI. [Ayala v. United States, supra, 371 F.2d 515.]

■■ Finally, appellant asserts that "the critical issue in this case is entrapment", pointing to the fact that "appellant has admitted his involvement in the transactions." Claims of prejudicial error must necessarily, then, pertain to the issue of entrapment alone. [See: Shaw v. United States, 374 F.2d 888 (9th Cir. 1967); Ortiz v. United States, 358 F.2d 107 (9th Cir. 1966); Ortega v. United States, 348 F.2d 874 (9th Cir. 1965).] And under our decisions, whether the facts relevant to the entrapment issue were as testified to by the informant and by Federal narcotics agent Lee, or as sworn to by appellant, was simply a credibility question for the jury. [See: Brown v. United States, 372 F.2d 478 (9th Cir. 1967); Enciso v. United States, 370 F.2d 749 (9th Cir. 1967); Beauregard v. Wingard, 362 F.2d 901 (9th Cir. 1966).] However, it is appellant's position here that there was proscribed entrapment as a matter of law; which is to say that the jury could not with reason find otherwise than that appellant was not a person predisposed to commit the crimes of which he stands convicted, but was an otherwise innocent person seduced by Government agents so to do. [See Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).]

The records reveal that appellant was the first witness to testify for the defense; and he told the jury, upon his direct examination, that he was 52 years of age; that he had been convicted of robbery and burglary "in the 30's"; that he "got out of the penitentiary in '42"; that in 1950 he "was convicted and given one year * * * and three years probation" for possession of narcotics; that in 1951 "the probation was violated, and * * * [he] was sent to San Quentin * * * [and] was transferred to Soledad"; that in 1955 he was released from prison, and in 1957 was again convicted of possession of narcotics, and was again imprisoned in San Quentin, from which he was transferred to Folsom penitentiary; that in March of 1960 he was released from Folsom on parole; and that he first met the informant in November of 1960 at San Francisco.

As to the entrapment issue, appellant testified upon his direct examination:

"Q. At what point were you aware that Mr. Lee was a Federal Agent?

"A. After the first meeting.

"Q. How did you know that?

"A. Well, the first time I was very suspicious, and the second time I knew he was.

"Q. Why did you continue on this charade then?

"A. Because [the informant] tricked me and I figured I was dead anyhow, so I just went ahead."

Measured by appellant's own admissions, we could not hold, as a matter of law, that he was the victim of a forbidden entrapment. In Sherman v. United States, supra, the Court declared: "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." [356 U.S. at 372, 78 S.Ct. at 821.] By his own words, however, appellant could not qualify in either category; whether "criminal" or "innocent", appellant asserts that he was anything but "unwary".

It would be difficult to envision a case farther than the case at bar is from that described in *Sherman* where, in the words of the Chief Justice, "the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." [356 U.S. at 376, 78 S.Ct. at 822.]

It is difficult, indeed, to find here even a factual issue approaching that described in the leading case of Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), where the Court declared that "the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the * * * [Government] agent * * *, defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and * * * the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation * * *." [287 U.S. at 441, 53 S.Ct. at 212.]

■ We assume nonetheless that appellant was entitled to have the entrapment issue submitted to the jury as a question of fact [see: Masciale v. United States, supra, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859; Lutfy v. United States, 198 F.2d 760, 762 (9th Cir. 1952)], and turn now to the errors claimed to stem from it.

■ As the second witness for the defense, appellant called Mr. Wilmer J. Leon, who was appellant's parole officer at the time of the heroin sales. Apparently, the purpose in calling the State parole officer was to show that there was close supervision over appellant during March of 1961, and to refute the informer's testimony that appellant was a "user" of heroin while on parole. Appellant now assigns as error the prosecution's asking the parole officer on cross-examination to recite from appellant's record or "rap sheet" a 1951 arrest entry reading: "11500 H & S Code (sale heroin)."

We assume that appellant is correct in contending that this inquiry was outside the scope of the direct examination covering appellant's record while on parole. We assume also that the parole officer was not subject to cross-examination as a character witness. However viewed, the eliciting of this item of evidence cannot stand as prejudicial error against the background of approximately thirty years of crime and imprisonment which appellant himself had just finished relating to the jury. Appellant's own testimony established that a year earlier, in 1950, he had been convicted of possession of heroin, and was later imprisoned for that offense.

■ Appellant nevertheless points to the fact that the 1951 entry related only to possession of narcotics, and that the phrase "sale heroin" on the record in the possession of his probation officer served only to describe the section of the California Code under which he was arrested. Appellant does not, however, suggest that this was within the knowledge of the prosecution, but argues only that the matter should have been investigated by the prosecution prior to inquiry of the witness in the presence of the jury, in order to establish "reasonable grounds" for submitting this bit of evidence. Such a contention, based on substantially similar circumstances, has been previously rejected by this Court; and we reject it here. [See Carlton v. United States, 198 F.2d 795, 797–799 (9th Cir. 1952).]

■ Relying as he did upon the claim of proscribed entrapment, appellant "cannot complain of a searching inquiry of his past conduct." [Sorrells v. United States, supra, 287 U.S. at 451, 53 S.Ct. at 216.] Having chosen to take the stand and testify in his own behalf, appellant was the one most likely to be able to offer explanation of the evidence in question; and having failed to explain or object to the admission of the parole officer's testimony, we find nothing in this record approaching "plain error" requiring reversal. [See Billeci v. United States, 290 F.2d 628 (9th Cir. 1961).]

Citing Notaro v. United States, 363 F.2d 169 (9th Cir. 1966), appellant contends that the trial court's instruction on

entrapment in the case at bar requires reversal because, so the argument goes, the instruction improperly assigned the burden of proof, and erroneously used the phrase "lawful entrapment" in explaining the issue to the jury. In *Notaro*, the court found possible confusion of the jury in that portion of the instruction there given as to the quantum of proof required to establish impermissible entrapment. The opinion points out too that "the defendant made a strong case for his defense of entrapment", noting that the trial judge remarked at the time of sentence: "I think if the jury had been waived * * * because of the closeness of the question of entrapment * * * I would have found entrapment." [363 F.2d at 172.]

In strong contrast to the case before us, Notaro distinctly stated his objection to the instruction given, and made timely request, as Rule 30 requires, that the jury be instructed that if they should "have any reasonable doubt from the evidence in the case as to whether the defendant was the victim of an unlawful entrapment, the jury should acquit the accused." [363 F.2d at 173.] The trial court refused Notaro's specific request so to instruct the jury; and it was this refusal, coupled with the instruction as given over Notaro's objection, that there led to reversal. [See Fed.R.Crim.P. 30.]

 In the case at bar, on the other hand, appellant's only "objection" to the entrapment instruction as given was: "We would rather prefer the language in the case of United States v. Sherman." Moreover, here the instruction on entrapment, although in most respects substantially the same as in *Notaro*, contained no suggestion of possibly different standards of proof with respect to the entrapment issue, as did the instruction given over objection in Notaro's case. To the contrary, the trial court here advised the jury again and again of the prosecution's burden of proving appellant's guilt beyond a reasonable doubt, explaining specifically: "That burden, as I say, rests upon the Government and never shifts to the Defendant. * * *

The law does not impose on a Defendant the burden of producing * * * any * * * evidence." [Cf. United States v. Armstrong, 339 F.2d 1015 (7th Cir. 1964).]

 Under the circumstances at bar, then, we think that the jury was properly advised of the burden-of-proof standard to be applied: that the burden always rests upon the prosecution to establish beyond a reasonable doubt not only that the accused committed the crimes charged, but also that in so doing he was not made the victim of a proscribed entrapment. [See Notaro v. United States, supra, 363 F.2d 169; cf.: United States v. Pugliese, 346 F.2d 861, 863 (2d Cir. 1965); Gorin v. United States, 313 F.2d 641, 654 (1st Cir. 1963).]

 It bears repeating that it is the duty of judges, no less than jurors, not to single out one instruction alone as stating the law but, as the trial judge so forcefully told the jury in the case at bar, to consider the instructions as a whole. And we cannot be reminded too often that trial by jury, as one of the distinctively characteristic institutions of the Anglo-American legal system, could not function without the benefit of the presumption that the jurors follow and obey the instructions of the court. [See: Shotwell Mfg. Co. v. United States, 371 U.S. 341, 367, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 77 L.Ed. 439 (1933); Husky Refining Co. v. Barnes, 119 F.2d 715, 717 (9th Cir. 1941).]

As to appellant's second objection to the entrapment instruction, we note that although use of the expressions "lawful entrapment" and "unlawful entrapment" in instructions to the jury has been criticized in the Second and Tenth Circuits [Martinez v. United States, 373 F.2d 810, 812 (10th Cir. 1967); Garcia v. United States, 373 F.2d 806, 809 (10th Cir. 1967); United States v. Pugliese, supra, 346 F.2d at 864–865], this usage

has not been the subject of criticism in this and other Circuits [Trice v. United States, 211 F.2d 513, 516 (9th Cir. 1954); United States v. Laverick, 348 F.2d 708 (3rd Cir. 1965); United States v. Thompson, 366 F.2d 167 (6th Cir. 1966); Cross v. United States, 347 F.2d 327 (8th Cir. 1965); see Sherman v. United States, supra, 356 U.S. at 372, 78 S.Ct. 819, 2 L.Ed.2d 848; see also Notaro v. United States, supra, 263 F.2d at 171, where this Court employed the phrase "illegal" entrapment.]

It is true, of course, that to the legal profession—judges and lawyers and law teachers—the term "entrapment" has become a word of art. [Cross v. United States, supra, 347 F.2d at 331; Ortiz v. United States, supra, 358 F.2d 107.] Yet, one has only to study the majority and minority opinions in Sorrells v. United States, supra, 287 U.S. 435, 453, 53 S.Ct. 210, 77 L.Ed. 413, and in Sherman v. United States, supra, 356 U.S. 369, 378, 78 S.Ct. 819, and to read the all-but-weekly writings from the Circuits on the subject, to be persuaded that this word of art—"entrapment"—embodies one of the most confusing concepts in the law. [Compare also, e. g., what Judge Learned Hand wrote in United States v. Sherman, 200 F.2d 880 (2d Cir. 1952) with what Chief Judge Aldrich recently wrote in Kadis v. United States, 373 F.2d 370 (1st Cir. 1967). Cf.: United States v. Bishop, 367 F.2d 806 (2d Cir. 1966); Lucas v. United States, 355 F.2d 245 (10th Cir. 1966); United States v. Morrison, 348 F.2d 1003 (2d Cir. 1965); Jordan v. United States, 348 F.2d 433 (10th Cir. 1965); Orfield, The Defense of Entrapment in the Federal Courts, 1967 Duke Law J. 39 (1967).]

If the entrapment concept is demonstrably confusing to judges and lawyers, then *a multo fortiori* it must be confusing to laymen on the jury. And it would seem doubly so, if trial judges attempt to have jurors discard their understanding of the everyday meaning of being "trapped" or "entrapped" [see Webster's New Collegiate Dictionary 275, 904 (1960 ed.)], and attempt to learn the meaning of the all-too-little-understood professional word of art. [Cf. United States v. Lauchli, 371 F.2d 303, 307–308 (7th Cir. 1966).]

In the ordinary narcotics case, as the opinions all too frequently attest, by the time the evidence is closed the jury has heard how Government agents posed as bona fide purchasers of heroin and thereby induced the accused to make the sale. If the jurors believe the evidence of the prosecution on that subject, they must believe without more that the accused has been entrapped—caught in a trap.

If the accused claims the entrapment was impermissible or proscribed as a matter of public policy, then surely the jury must also decide whether the conceded entrapment was lawful or unlawful. As the Chief Justice put it in Sherman v. United States, supra, "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." [356 U.S. at 372, 78 S.Ct. at 821.]

Surely the trap for the "unwary criminal" is a lawful one, and the trap for the "unwary innocent" must *ex necessitate* be an unlawful one. No better way occurs to us whereby to make the distinction clear to the jury than by way of contrast, which was the method of the trial judge in the case at bar.

We think it requires but little reflection to convince that the difficulties in giving effect to the public policy upon which the mis-called "defense" of entrapment is based would lessen considerably, if the matter were withdrawn as a fact question for the jury and consigned to the "supervisory authority over the administration of criminal justice in the federal courts." [See McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943).] In this connection, it is interesting to note that the Court has as yet declined "to reassess the doctrine of entrapment." In Sherman v. United States, supra, the reason

given was that to do so "would be to decide the case on grounds * * * not raised here or below by the parties before us." [356 U.S. at 376, 78 S.Ct. at 823.] The same reason was given in Masciale v. United States, supra, 356 U.S. at 388 n. 5, 78 S.Ct. at 829, 2 L.Ed.2d 859. Five years later, in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), Mr. Justice Harlan observed for the Court that: "Petitioner does not claim that the issue of entrapment should always be decided by the court and never submitted to the jury, and we are not now presented with that question." [373 U.S. at 436 n. 7, 83 S.Ct. at 1386.] If the question were *res integra* here, we would readily certify to the Court [see 28 U.S.C. § 1254(3)] the question whether the issue of entrapment should not always be decided by the court and never submitted to the jury. [See: Kibby v. United States, 372 F.2d 598, 601 (8th Cir. 1967); United States v. Lauchli, supra, 371 F.2d at 308; United States v. Morrison, supra, 348 F.2d at 1004–1005; but see United States v. Riley, 363 F.2d 955, 958–959 (2d Cir. 1966).]

In the case at bar, it was the jury's burden to decide whether appellant was one of the "unwary innocent" or among the "unwary criminal"; that is to say, whether he was seduced by Government agents to commit the crime of heroin peddling. [Cf.: Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966).] One cannot read the record without noting the abundant evidence of "propensity" which appellant himself supplied. Since propensity disclosed by appellant's criminal record and prison experience is of great probative value on the ultimate issue of appellant's claimed seduction or inducement [cf. United States v. McMillan, 368 F.2d 810, 812 (2d Cir. 1966)], we are of the opinion that the jury acted upon overwhelming evidence and under correct instructions to convict appellant in the face of his claim of impermissible entrapment.

Affirmed.